## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| **KELLEY A. EDINGTON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case number 1:11cv0127 TCM** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

This is a 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security (Commissioner), denying the applications of Kelley A. Edington for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. § 1381-1383b.[1]  Ms. Edington (Plaintiff) has filed a brief in support of her complaint; the Commissioner has filed a brief in support of his answer.

### Procedural History

Plaintiff applied for DIB and SSI in May 2008, alleging she was disabled as of March 17, 2005, by staph infections, back and knee problems, carpal tunnel syndrome, and

---

[1]The case is before the undersigned United States Magistrate Judge by written consent of the parties.  See 28 U.S.C. § 636(c).

depression.  (R.[2] at 128-46.)  Her applications were denied initially and after a hearing held

in May 2010 before Administrative Law Judge (ALJ) Joseph L. Heinmann.  (Id. at 8-56, 63-

65, 73-77, 80-84.)  The Appeals Council denied Plaintiff's request for review, effectively

adopting the ALJ's decision as the final decision of the Commissioner.  (Id. at 1-3.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, and John Stephen Dolan, a vocational expert,

testified at the administrative hearing.

Plaintiff, 35-years old at the time of the hearing, testified that she lives in a trailer

with her son and her son's father.  (Id. at 34.)  She receives food stamps and energy

assistance.  (Id. at 45.)  She is 5 feet 2 inches tall and weighs approximately 235 pounds.

(Id. at 42.)  She had been held back in first grade, has completed the tenth grade, and has

tried, but failed, to obtain a General Equivalency Degree (GED).  (Id. at 26.)  She had been

in special education classes when her family lived in Wynne, Arkansas; however, when her

family moved to another district, that district did not have a special education program so

she fell behind again.  (Id. at 47.)  Her weakest academic areas had been in English, Social

Studies, and Science.  (Id. at 27.)  She can read a newspaper, but not understand it.  (Id.)

She had started a program to become a nurse assistant, but was unable to complete it.  (Id.

at 27-28.)

---

[2]References to "R." are to the administrative record filed by the Commissioner with his
answer.

Asked why she became disabled on March 17, 2005, Plaintiff explained that she was still having "a lot of complications" even after her son turned one in January 2004 and "everybody told [her] she at least needed to try to do something . . . ." (Id. at 28.) She had first filed for disability in 2004. (Id.) After those applications were denied, she filed again in 2008 because she did not know what else to do. (Id.)

Plaintiff last worked in 2003. (Id. at 29.) In 1993, she worked for Clayton Shoes making shoe boxes and doing some shoe repair. (Id. at 29-31.) She worked as a cashier at a general store in Germany when her ex-husband was stationed there. (Id. at 31.) She has also worked (a) on an assembly line packing candy boxes and in that company's craft department making bows and ribbons, (b) for a county health department helping to give home-bound people baths, and (c) for Richland Foods as a "dump operator." (Id. at 31-33.) This last job required that she weigh trucks coming in with loads of rice, operate the dump to unload the rice, weigh the trucks "back out," and sign the drivers' tickets. (Id. at 33.) It was a seasonal job. (Id.)

Plaintiff testified that she is not able to do much for her son. (Id. at 34.) She does get him up and ready for school in the morning. (Id. at 34-35.) The school bus picks him up at the driveway, and he gets breakfast at school. (Id. at 35.) She tries to do some housework, but usually goes back to bed after he leaves. (Id.) Her son's father works the day shift at a sawmill. (Id.)

- 3 -

Approximately once a month, Plaintiff goes grocery shopping.  (<u>Id.</u> at 36.)  She tries to get someone to go with her because it is hard for her to walk and carry the groceries.  (<u>Id.</u>)

Asked what her major physical concern was that prevents her from working, Plaintiff replied that it was her skin breakouts due to a staph infection.  (<u>Id.</u> at 36.)  She was not on any medication for it.  (<u>Id.</u>)  She does not have a way to go to the doctors, so she tries over-the-counter remedies and lets the infection take its course.  (<u>Id.</u>)  The infection is contagious.  (<u>Id.</u> at 48.)  When she has a flare-up, she has breakouts all over her body, but concentrated in her face and arms.  (<u>Id.</u> at 37.)  Her next concern is her hands and back.  (<u>Id.</u>)  Specifically, the pain in her right hand is so bad that she drops things.  (<u>Id.</u> at 38, 39.)  The doctors had done carpal tunnel release surgery on the less severe hand, her left hand, first because she needed to use her right hand to take care of her then-infant son.  (<u>Id.</u> at 38.)  Now, she cannot afford to go to a doctor or to take pain medication.  (<u>Id.</u>)  She has friends that come and help her with laundry.  (<u>Id.</u> at 40.)  Her back hurts if she sits or stands too long, or if she lays down or pulls up her legs in a certain way.  (<u>Id.</u> at 41.)  She last saw a doctor about her back in February 2009.  (<u>Id.</u>)

Her only pain medication is Ibuprofen or Tylenol, which she takes every four to six hours if her  back "is really hurting."  (<u>Id.</u> at 42.)  This happens "every other day."  (<u>Id.</u>)  Also preventing her from working are her feet – they swell and hurt.  (<u>Id.</u>)  She cannot walk for longer than five minutes before her legs and back hurt so badly she has to stop.  (<u>Id.</u> at 43.)  Nor can she stand for longer than five minutes before having to sit down.  (<u>Id.</u>)  The

heaviest thing she can lift is a gallon of milk.  (Id.)  She would not be comfortable with a sit/stand option because she would be afraid of falling when standing up.  (Id. at 44.)

Asked if there is a mental health concern that keeps her from working, Plaintiff explained that there is; specifically, she can not function or remember.  (Id. at 44, 45.)  She was diagnosed with depression when she was 19 or 20 years old.  (Id. at 45.)  She was supposed to be taking antidepressants, but could not afford them.  (Id.)  She has not been back to the clinic she went to in January – she still owes them money.  (Id. at 46.)

There are many days when Plaintiff does not seem able to function at all.  (Id. at 46-47.)  She spends most of those days in bed.  (Id. at 47.)  Asked to give an estimate, Plaintiff testified that 90 percent of the time she stays in bed.  (Id.)

Testifying as a vocational expert (VE), Mr. Dolan classified Plaintiff's work as a cashier as unskilled and, as she described it, of a medium exertional level; as a hand packager as unskilled and, as she described it, light; as a production line assembler as unskilled and light; as a box folding machine operator as semiskilled and medium; as a dump operator as semiskilled and light; as a store laborer as unskilled and medium; and as a home attendant semiskilled and, as she described it, heavy.  (Id. at 50-51.)

The ALJ asked the VE to assume a hypothetical person of Plaintiff's age, limited education, past work experience, and no transferable skills who is capable of light work[3] with the exception of being limited to only occasional climbing of ladders, ropes, and

_____

[3]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. § 404.1567(b).

scaffolds.  (Id. at 51.)  The VE testified that this person could perform Plaintiff's past work as a dump operator, line assembler, hand packager, and cashier, the latter as it is described in the *Dictionary of Occupational Titles* (DOT) and not as described by Plaintiff.  (Id.)

If this hypothetical person also could not do bilateral fine manipulation for up to a total of ninety minutes a day and would "need to rest their hands," there were no jobs the person could do.  (Id. at 52.)  If, however, the person could continue to use their hands for such things as gripping but could only occasionally do fine manipulation bilaterally, the person could perform Plaintiff's past relevant work as a dump operator and box folding machine operator.  (Id. at 52-53.)  These same two jobs would be available for this person if she was limited to a low stress job.  (Id. at 53.)

The VE further testified that, with the exceptions of the jobs of cashier, hand packager, and home attendant, his testimony was consistent with the DOT.  (Id. at 53-54.)

The ALJ then noted that Plaintiff had been sent for a consultative examination one and one-half years earlier and asked her counsel if it was his position that there had been no fundamental change in her condition.  (Id. at 54.)  Counsel affirmed that that was his position.  (Id.)  After the ALJ also noted the limited amount of records relating to depression, he stated that he did not intend to order a mental health consultative examination.  (Id.)  Counsel replied, "[G]iven the choice between not sending her out for one and sending her out for one, I suppose I would not want to preclude the possibility that seeing one might make a difference so I'll respect your decision but sure, I'd like to see her

have a consultation." (Id. at 54-55.)  The ALJ indicated that he would consider the request.
(Id.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part
of the application process, documents generated pursuant to her applications, records from
various health care providers, and reports of examining and nonexamining consultants.

When applying for DIB and SSI, Plaintiff completed a Disability Report, listing her
height as 5 feet 2 inches tall and her weight as 265 pounds.  (Id. at 220-28.)  She does not
have a medical assistance card.[4]  (Id. at 220.)  She was limited in her ability to work by a
staph infection, depression, carpal tunnel syndrome, and problems with her back, knees, and
ankles.  (Id. at 221.)  Because of these impairments, she cannot grip anything with her right
hand, which is always painful.  (Id.)  The staph infection causes her to break out in sores all
over her body; therefore, no one will hire her.  (Id.)  She cannot stand for long because of
her back problems.  (Id.)  It hurts for her to sit or stand for long also.  (Id.)  She has trouble
lifting or carrying anything, including her 39-pound son.  (Id.)  She has trouble
concentrating and remembering things, including what she did the day before.  (Id.)  These
impairments caused her to be unable to work as of March 17, 2005.  (Id.)  She stopped
working on November 15, 2003, when her seasonal job ended and she was having a
problem pregnancy.  (Id.)  The job she has held the longest is as a stocker and cashier at
convenience or retail stores.  (Id. at 222.)  This job required that she walk two hours, stand

---

[4]When earlier applying for DIB and SSI, Plaintiff reported on a Disability Report form that
she had a medical assistance card.

four hours, climb two hours, stoop three hours, kneel one hour, crouch one hour, and crawl one hour each day.  (Id. at 222-23.)  Also, she handled big objects for two hours, reached for four, and wrote or handled small objects for four.  (Id. at 223.)  The heaviest weight she lifted was fifty pounds; the weight she frequently lifted was twenty pounds.  (Id.)  After four years of a home schooling class, she received a high school diploma through the Standford Institute in January 2007.  (Id. at 228.)

On a Work History Report, Plaintiff listed seventeen jobs she had held between 1993 and October 2003, inclusive.  (Id. at 187-215.)  She had worked at the shoe factory from 1993 to 1998 and at the rice drier company from August 2001 to October 2003.  (Id. at 187.)  Her tenure at several positions overlapped, e.g., she listed a job as a stacker at a coil-making factory from 1993 to 1998, when she was also at the shoe factory, a store clerk at a military store, a book deliverer for a newspaper factory, and a waitress.  (Id. at 187-88.)  Her job at the rice drier company was from August to November.  (Id. at 193.)  She worked ten hours a day, seven days a week.  (Id.)  For a total each day, she walked ten hours, stood ten hours,[5] stooped for one, knelt for one, crouched for one, handled big objects for one, reached for one, and wrote or handled small objects for eight.  (Id. at 193-94.)  The heaviest weight she had to lift was thirty-five pounds; the weight she had to frequently lift was twenty-five pounds.  (Id. at 194.)  She shoveled rice four hours each day.  (Id.)

_____

[5]The seeming impossibility of being able to stand and walk for a total of twenty hours each day is not explained.

Plaintiff reported on a Missouri Supplemental Questionnaire that the primary symptoms that keep her from working are caused by her staph infection.  (<u>Id.</u> at 234-41.) Activities such as cleaning make her symptoms worse.  (<u>Id.</u> at 234.)  She is able to do laundry, wash dishes, and make beds; however, these chores are hard on her back and knees. (<u>Id.</u> at 237.)  Once a month, she shops for groceries for approximately ninety minutes.  (<u>Id.</u>) She has had difficulties sleeping since 1998.  (<u>Id.</u>)  On an average day, she gets up, eats breakfast, gets her son some breakfast, sits around the house, and then goes to bed.  (<u>Id.</u> at 238.)  She spends most of her day watching television.  (<u>Id.</u>)  She can watch a two-hour show, but it is hard for her to sit for long in one spot.  (<u>Id.</u>)  She has problems reading the newspaper because she cannot focus for very long.  (<u>Id.</u>)  She has a driver's license, and drives to the store or to visit people once or twice a month.  (<u>Id.</u> at 239.)  She has problems following instructions because she cannot understand them or focus.  (<u>Id.</u>)

An earnings report generated for Plaintiff includes the years from 1993 to 2003, inclusive. (<u>Id.</u> at 151.)  Her highest annual earnings were $8,591[6] in 2002; her lowest were $285, in 2000.  (<u>Id.</u>)  Her earnings in the last reported year, 2003, were $4,275.  (<u>Id.</u>)

Plaintiff completed a Disability Report – Appeal form after the initial denial of her applications.  (<u>Id.</u> at 255-60.)  There had been no changes, for better or worse, in her previously-described impairments.  (<u>Id.</u> at 256.)  She was taking Prozac for depression.  (<u>Id.</u> at 257.)  There were times she could not get out bed because of back pain.  (<u>Id.</u> at 258.)  If

---

[6]All amounts have been rounded to the nearest dollar.

she tried to clean or mop, her hand would be so painful she could not grip anything for days. (Id.)

The relevant medical records[7] before the ALJ are summarized below in chronological order[8] and begin in December 2004 when Plaintiff underwent a nerve conduction study and was found to have moderate carpal tunnel syndrome on the right and mild to moderate on the left.  (Id. at 340-41.)

Plaintiff had a magnetic resonance imaging (MRI) of her lumbar spine in January 2005; it was normal.  (Id. at 365-66.)

Plaintiff underwent carpal tunnel release surgery on her left wrist in April.  (Id. at 362-64.)

Plaintiff consulted Dr. Darrell Hutchinson with the Family Medical Center in May for refills of her medications, including Lexapro[9] (an anti-depressant[10]), a painful right foot, and a sporadic headache for the past week.  (Id. at 312.)  In the checklist format of Dr. Hutchinson's notes, the lines for "Rash/abn lesion(s)" and back tenderness are marked.  (Id.)

_____

[7]Omitted are summaries of medical records relating to gynecological problems and Plaintiff's pregnancy.  (See id. at 345-54, 367-73.)

[8]A request to Naylor Medical Clinic for their records was returned with a notation that Plaintiff had made an appointment and then had called to cancel it.  (Id. at 314-15.)  There is no indication of when the appointment was or why it had been made.

[9]Lexapro is the only legible medication; however, because Dr. Hutchinson refers to "refills," the Court assumes that more than one medication was being prescribed.

[10]See Physicians' Desk Reference, 1130 (65th ed. 2011).

Plaintiff's diagnoses include depression and obesity.  (Id.)  She was to be referred to a mental health clinic.  (Id.)

Plaintiff returned to Dr. Hutchinson in June.  (Id. at 311.)  She was diagnosed with depression and prescribed Lexapro and Elavil, another anti-depressant.[11]  (Id.)  When she saw him on August 9, she reported that her headaches were bad.  (Id. at 310.)  She was prescribed Prozac in addition to the Elavil.  (Id.)

Pursuant to the referral of Dr. Hutchinson, Plaintiff saw Jerry Cunningham, Psy.D., with Mid-South Health Systems, Inc. (MSHS), on August 16 to establish a therapeutic relationship.  (Id. at 274-87.)  She reported having no motivation to get out of bed and take care of herself.  (Id. at 276.)  What energy she did have, she spent taking care of her son. (Id.)  She lacked the desire to go outside and do things she formerly enjoyed.  (Id.)  She further reported having daily problems with her eating patterns; depression (the last time she had been happy was when her son was born eighteen months earlier); bereavement (her biological father had died shortly before her son was born); and anxiety.  (Id. at 276.)  She had weekly problems with being angry at herself, her boyfriend, and her father.  (Id.)  She had problems getting to sleep and staying asleep.  (Id. at 277.)  She constantly felt tired. (Id.)  She had friends she enjoyed talking to and doing things with; however, she did not spend as much time with them as was possible.  (Id. at 278.)  She was taking Prozac.  (Id. at 279.)  She was emotionally abused by her ex-husband and by her boyfriend.  (Id. at 281.)  On examination, her insight and judgment were good.  (Id.)  She was oriented to person,

---

[11]See Elavil, http://www.drugs.com/search.php?searchterm=elavil (last visited Sept. 24, 2012).

place, time, and situation.  (Id.)  Plaintiff was diagnosed with depressive disorder, not

otherwise specified.[12]  (Id. at 274, 283, 284.)  Her current Global Assessment of Functioning

was 60.[13]  (Id. at 283, 284.)  Three goals for Plaintiff were identified, i.e., to be happy again,

to have more self-esteem, and to have a purpose again, as were the steps she would take to

help her achieve those goals, e.g., she would identify three things in her life that were

contributing to her depression.  (Id. at 285-87.)  She was to meet with Dr. Cunningham three

to five times a month until February 2006.  (Id.)  Payment for the sessions was a

combination of self-pay and state funding.  (Id. at 274.)  Her prognosis was good.  (Id. at

282.)

Plaintiff met with Dr. Cunningham again on August 23 and discussed the difficulties

of her present living situation, i.e., her boyfriend lived with her and would not leave.  (Id.

at 292.)

––––––––––––––––––––

[12]According to the [*Diagnostic and Statistical Manual of Mental Disorders* (4th Ed. Text Revision 2000] DSM-IV-TR, each diagnostic class, e.g., adjustment disorder, has at least one "Not Otherwise Specified" category.  DSM-IV-TR at 4.  This category may be used in one of four situations:  (1) "[t]he presentation conforms to the general guidelines for a mental disorder in the diagnostic class, but the symptomatic picture does not meet the criteria for any of the specific disorders"; (2) "[t]he presentation conforms to a symptom pattern that has not been included in the DSM-IV but that causes clinically significant distress or impairment"; (3) the cause is uncertain; or (4) there is either insufficient data collection or inconsistent, contradictory information, although the information that is known is sufficient to place the disorder in a particular diagnostic class.  Id.

[13]"According to the [DSM-IV-TR], the Global Assessment of Functioning Scale [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010).  A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV-TR at 34 (emphasis omitted).

Plaintiff called and rescheduled her appointment on August 30 and again on September 1. (Id. at 290-91.) She neither called nor rescheduled her September 13 appointment. (Id. at 289.)

Plaintiff went to the emergency room at the Poplar Bluff Regional Medical Center after falling in January 2006 and injuring her left hand. (Id. at 297-304, 355-61.) An x-ray revealed no bone or joint abnormality, no fracture, and no dislocation. (Id. at 298, 303, 356, 360.) Plaintiff was diagnosed with a ligamentous sprain of her left wrist and discharged within an hour with instructions to follow up with her personal care physician within three days. (Id. at 301, 303-04.)

On August 14, more than one year after last seeing Dr. Hutchinson, Plaintiff saw him again to discuss her depression. (Id. at 309.) In addition to depression, she was diagnosed as being morbidly obese. (Id.) Her weight was then 259 pounds. (Id.) She was prescribed Prozac and was to return in one month. (Id.) Plaintiff returned in three months. (Id. at 308.) Her left jaw was swollen and painful, and she needed a refill of her prescription for Prozac. (Id.)

Sixteen months later, in December 2007, Plaintiff saw Dr. Hutchinson for refills of her medications and for complaints of sinus and chest congestion and headaches. (Id. at 307.) She was prescribed an antibiotic. (Id.) She did not have any money, so her mother was to pick up the prescription and take it to her. (Id.) She was also to be referred to MSHS. (Id.)

Plaintiff did not seek medical treatment in 2008.

She returned to the Family Medical Center in February 2009 for complaints of low back pain for the past five years.[14]  (Id. at 338-39.)  If she pulled her legs up when laying on her back, she lost feeling in both legs.  (Id. at 338.)  Also, she had numbness and tingling in both legs.  (Id.)  Ibuprofen did not give her any relief.  (Id.)  On examination, Plaintiff was tearful and uneasy when sitting.  (Id. at 339.)  She was scheduled for an MRI of her lumbar spine, which was done three days later.  (Id. at 339, 343-44, 380-81.)  The MRI showed a "grossly normal" alignment of the lumbar spine with well-maintained disc spaces.  (Id. at 344, 381.)

Plaintiff returned to the Family Medical Center in March with complaints of a cough and congested head.  (Id. at 337.)  She was diagnosed with bronchitis, prescribed an antibiotic, and told to drink plenty of fluids and to rest.  (Id.)

Plaintiff underwent a mental health assessment by Naveed J. Mirza, M.D., and Debra Price, a mental health nurse practitioner, at Kneibert Clinic in January 2010 for a "mental problem."  (Id. at 374-78.)  Recent "stressors" included her mother's recent cancer diagnosis and the deaths of several family members.  (Id. at 374.)  She reported having problems with depression and remembering things.  (Id.)  She rated her depression – first diagnosed in 1997 – as an eight or nine.  (Id.)  She had been taking medication for depression, but could no longer afford it.  (Id.)  She was having problems sleeping, concentrating, getting things done, and enjoying things.  (Id.)  She had decreased energy, racing thoughts, increased anxiety, mood swings, and an increase in the number of panic attacks.  (Id.)  She was

---

[14]The name of the physician is illegible.

divorced and living with the father of her child.  (Id. at 376.)  She had "a meaningful relationship" with the father.  (Id.)  She had quit high school to get married.  (Id.)  She had not worked since her son was born.  (Id.)  On examination, she was alert and oriented to time, place, and person.  (Id. at 377.)  She had a neutral affect, cooperative attitude, appropriate appearance, productive thought, normal speech, neutral mood, and fair insight and judgment.  (Id.)  She was diagnosed with depression, generalized anxiety disorder, and panic disorder.  (Id. at 377, 378.)  Her GAF was 60.  (Id. at 377.)  It was noted that Plaintiff "does not have a mental health illness that keeps her from being employed."  (Id. at 378.)  She would benefit from medication.  (Id.)

Also before the ALJ were several assessments of Plaintiff done pursuant to her applications.

Chul Kim, M.D., examined Plaintiff on August 11, 2008.  (Id. at 317-22.)  Her chief complains were a skin infection; back and knee problems; carpal tunnel syndrome; and depression.  (Id. at 317.)  He summarized the history of each complaint as follows.

1.  Skin Infection
In 1997 she developed skin infection all over and that involved oral cavity as well and she was found to have staphylococcal infection and was given antibiotics and home health nurse care for about a month.  Since then she has had skin infection off and on and today she has a few pimple type spots on the face, neck, hands and etc. but she does not take any medicine at this time.

2.  Back problem
In 2003 during her pregnancy with her son she developed lower back pain and that has persisted until this time as a sharp pain and sometimes her back is very stiff.  If she lies on her back in a certain way she cannot move and previous MRI did not show a significant abnormality.  She is able to stand on her feet for 30 minutes, to walk half a block, to sit for about 30 minutes, to drive about a mile once in a while and to lift about 10 pounds.

- 15 -

3.  Knee Problem

When she was 12 or 13 years old while playing basketball she fell and injured her left knee, but bones were not broken.  However since that time she has had pain with intermittent swelling of the left knee until this time.  Lately the knee has been swollen about twice a month and each time it lasts for about 2 days.

4.  Carpel [sic] Tunnel Syndrome

When she was 18 years old she developed carpel [sic] tunnel syndrome and she underwent surgery for left hand in 2005 and it is alright but left hand grip is not as good as it used to be but her right hand and wrist still swell up off and on and the pain goes up to the right elbow.

5.  Depression

Since she was 19 years old she has been depressed and once she attempted suicide at the age of 19 but did not go to the mental hospital and she saw a psychiatrist about 4 months ago and currently she is on medication with benefit but lately it does not work as well as before and she does not have suicidal thoughts anymore.

(Id. at 317-18.)  Plaintiff had finished the tenth grade, was divorced, and had a child.  (Id. at 318.)  She had frequent headaches, was occasionally dizzy, had impaired vision, had occasional difficulty swallowing, and was short of breath when she lay down.  (Id.)  Sometimes, she had substernal chest pain at night.  (Id. at 319.)  She had been diagnosed with acid reflux disease; the prescribed medication had been of benefit, but she was no longer taking it.  (Id.)  She had occasional bilateral lower abdominal pain.  (Id.)  Her appetite was not good; however, she kept gaining weight.  (Id.)  On examination, she was 5 feet 1.5 inches tall and weighed 254 pounds.  (Id.)  She was in no acute distress.  (Id.)  Her mental state was clear; she had a good memory and was cooperative.  (Id.)  She could flex her lumbar spine to 65 degrees with lower back pain but without significant paralumbar muscle spasm.  (Id. at 319, 322.)  Her knees had limited flexion to 100 degrees with pain

- 16 -

in the knees and lower back.  (Id. at 320, 321.)  "[R]ange of motion activity of bilateral hips gave her lower back pain and flexion and abduction of both shoulders gave her pain in the elbows and lower back."  (Id. at 320.)  Her right wrist had limited dorsi flexion and palmar flexion with pain.  (Id. at 320, 321.)  "[S]traight leg raising was up to 40 degree [sic] on the right side and 60 degree [si] on the left side with lower back pain."[15]  (Id. at 320.)  Her hand grip and fine finger movements were normal.  (Id. at 320, 321.)  She walked with a stable gait, bore full weight on her left leg and right leg, could walk on heels and toes, and could get on and off the examining table without a significant problem.  (Id. at 320.)  She could not squat even half way without pain in both knees.  (Id.)  There was no edema in either leg.  (Id.)  She had a moderate degree of decreased deep tendon reflexes in both knees.  (Id.)  Dr. Kim's impression was of history of staphylococcal infection of the skin and oral cavity in 1997 and intermittent episodes of minor skin infection since; chronic lower back pain with lumbar strain; chronic knee pain with probable degenerative joint disease; bilateral carpal tunnel syndrome; depression; morbid obesity; exertional dyspnea, probable due to obesity; acid reflux disease; and decreased deep tendon reflexes in both knees.  (Id.)

Three days later, a Physical Residual Functional Capacity Assessment of Plaintiff was completed by Aaron Spratt, who is a "single decision-maker"[16] and not a medical

---

[15]"During a [straight leg raising] test a patient sits or lies on the examining table and the examiner attempts to elicit, or reproduce, physical findings to verify the patient's reports of back pain by raising the patient's legs when the knees are fully extended."  **Willcox v. Liberty Life Assur. Co. of Boston**, 552 F.3d 693, 697 n.3 (8th Cir. 2009) (internal quotations omitted).

[16]See 20 C.F.R. §§ 404.906, 416.1406 (defining role of single decisionmaker under proposed modifications to disability determination procedures). See also **Shackleford v. Astrue**,

consultant.  (Id. at 57-62.)  The primary diagnoses were morbid obesity and degenerative

joint disease; the secondary diagnoses were lumbar strain and history of carpal tunnel

syndrome.  (Id. at 57.)  These impairments resulted in exertional limitations of Plaintiff

being able to occasionally lift or carry twenty pounds; frequently lift or carry ten pounds;

stand or walk for two hours in an eight-hour workday; and sit for approximately six hours

in an eight-hour day.  (Id. at 58.)  Her ability to push and pull was otherwise unlimited.  (Id.)

She had postural limitations of being able to only occasionally balance, stoop, kneel, crouch,

crawl, and climb ramps and stairs.  (Id. at 59-60.)  She should never climb ladders, ropes,

or scaffolds.  (Id.)  She had no manipulative, visual, communicative, or environmental

limitations.  (Id. at 60-61.)

        The same month, Marshal Toll, Psy.D., completed a Psychiatric Review Technique

form.  (Id. at 323-34.)  She assessed Plaintiff as having an affective disorder, depression,

which was not severe.  (Id. at 323, 326.)  This disorder caused mild difficulties in

maintaining concentration, persistence, or pace, but no other functional limitations.  (Id. at

331.)  Nor did it cause any repeated episodes of decompensation of extended duration.  (Id.)

## **The ALJ's Decision**

        Analyzing Plaintiff's application under the Commissioner's five-step evaluation

process, the ALJ first found that Plaintiff met the insured status requirements through

September 30, 2006, and had not been engaged in substantial gainful activity since her

_____

2012 WL 918864, *3 n.3 (E.D. Mo. Mar. 19, 2012) ("Single decision-makers are disability
examiners authorized to adjudicate cases without mandatory concurrence by a physician.") (citation
omitted).

- 18 -

alleged disability onset date of March 17, 2005.  (Id. at 12-13.)  The ALJ next found that Plaintiff had severe impairments of lumbar strain, obesity, depression, and a history of carpal tunnel syndrome.  (Id. at 13.)  Her non-severe impairments included the staph infection, knee problems, upper respiratory infections, acid reflux, gynecological problems, and intellectual functioning level.  (Id. at 13-14.)  Dr. Kim had noted a few pimple spots when seeing Plaintiff and at the hearing she had "a few areas of pimple-type rash on the face and neck, but no evidence of a serious infection."  (Id. at 14.)  The only treatment sought was over-the-counter Neosporin, and there was no evidence of any work-related limitation caused by the infection.  (Id.)  There were no records of any specific medication or treatment for her knee pain, nor was there any objective evidence to support Dr. Kim's diagnosis of probable degenerative joint disease.  (Id.) Rare complaints of upper respiratory infections were resolved by antibiotics and over-the-counter medications.  (Id.)  There was no evidence that she had required regular medication or treatment for her acid reflux disease or that the disease caused any work-related limitations.  (Id.)  Plaintiff had a limited education and testified that she had been in special education classes; however, she was able to read and had worked at several semi-skilled jobs without difficulty.  (Id.)

Plaintiff's severe impairments, including her mental impairments, did not, singly or in combination, meet or medically equal an impairment of listing-level severity.  (Id.)

Addressing Plaintiff's mental impairments, the ALJ found she had mild restrictions in the activities of daily living, mild difficulties in social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.  (Id. at 15.)  Specifically, she

could perform a variety of household chores, had no problems with hygiene and grooming, got along with friends and family members, left her house regularly, and could care for her six-year old son.  (Id.)  She had no episodes of decompensation of extended duration.  (Id.)

Plaintiff has, the ALJ concluded, the residual functional capacity (RFC) to perform light work except that she can only occasionally stoop, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, and scaffolds.  (Id. at 15-16.)  She can also only occasionally perform fine manipulation.  (Id. at 16.)  She is limited to low-stress jobs, i.e., jobs requiring only occasional decision-making duties and changes in the work setting.  (Id.)

When assessing Plaintiff's RFC, the ALJ evaluated her descriptions of her symptoms and found them not to be entirely credible.  (Id. at 16-19.)  He noted that Plaintiff had been able to work at her weight of 235 pounds for years without difficulty and had not reported that her weight prevents her from working.  (Id. at 16.)  The MRI of her lumbar spine was negative.  (Id. at 17.)  And, she was noted to be able to walk with a stable gait, bear full weight on the left leg and the right leg, walk on her heels and toes, and get on and off the examining table without difficulty.  (Id.)  He had no medication or treatment for her low back pain until February 2009, following which she had a normal MRI.  (Id.)  She had some outpatient counseling in August 2005, but also then had a GAF of 60, indicative of mild limitations in functioning.  (Id.)  She continued to be prescribed Prozac from her primary care physician through November 2006.  (Id.)  She reported to Dr. Kim that she had been diagnosed with depression in 1997, but had not sought or received any specific mental health treatment until January 2010.  (Id.)

- 20 -

Also detracting from Plaintiff's credibility was her choice of disability onset date. The record did not indicate that there was any event that occurred on that date; rather, that was the day after her previous DIB and SSI applications had been denied.  (Id. at 18.)  Her limited earnings before that date suggested that she was not particularly motivated to work, and she had testified that she had not looked for work after her son was born in January 2004.  (Id.)  No doctor who had treated or examined Plaintiff had placed any limitation on her exertional activities.  (Id.)  She has never had regular medical attention or treatment, nor was there any indication she had been refused such because of an inability to pay.  (Id.)  She had had no recent surgery or inpatient hospitalizations since her allege disability onset date, and had not been referred to physical therapy for her complaints of low back pain.  (Id.)  There was no indication that any medication had caused her side effects.  (Id.)  She did not have any of the signs typically associated with chronic, severe musculoskeletal pain and had been able to walk in and out of the hearing room without significant difficulty and to sit normally.  (Id.)  To the extent that Plaintiff's daily activities were restricted, the ALJ found them to be so by choice and not by medical necessity.  (Id. at 19.)

With her RFC, the ALJ concluded, Plaintiff could perform her past relevant work as a dump operator as it was actually and generally performed.  (Id. at 19-20.)  The VE had described this work as semi-skilled and requiring only "light type exertion."  (Id. at 19.)

Plaintiff was not, therefore, disabled within the meaning of the Act.  (Id. at 20.)

## Additional Records Before the Appeals Council

After the ALJ issued his adverse decision, Plaintiff submitted the records of Sheila Hellman, D.O., at Family Medical Center, from when Plaintiff consulted her in October 2010 for high blood pressure for the past two to three days. (Id. at 385-87.) Her weight was 238 pounds.[17] (Id. at 385.) It was noted that most of her blood pressure readings in her chart were not elevated. (Id. at 386.) She was asked to come back several times over the next few weeks to have her blood pressure read. (Id. at 386.) She was also advised to modify her sodium intake, do daily aerobic exercise, and lose weight. (Id.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002). "Each step in the disability determination

---

[17]In her supporting brief, Plaintiff mistakenly lists her weight as 278 pounds. (See Pl. Br. at [7], ECF No. 13.)

entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the claimant must have a severe impairment. See 20 C.F.R. §§ 404.1520(c), 416.920(c). A "severe impairment" is "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." Id. Accord **Martise v. Astrue**, 641 F.3d 909, 923 (8th Cir. 2011); **Pelkey v. Barnhart**, 433 F.3d 575, 578 (8th Cir. 2006). Conversely, "[a]n impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to work to do basic work activities." **Kirby v. Astrue**, 500 F.3d 705, 707 (8th Cir. 2007). "Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard . . . ." **Id.** at 708 (internal citations omitted).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations." **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "[RFC] is not the ability merely to lift weights occasionally in a doctor's

office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted). Moreover, "'a claimant's RFC [is] based on all relevant evidence including the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887).  "'The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record.  [A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995)) (second alteration in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2001).  This evaluation requires that the ALJ consider "'(1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.'" **Buckner v. Astrue**, 646 F.3d 549, 558 (8th Cir. 2011) (quoting Moore, 572 F.3d at 524, which cited Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)).  "Although 'an ALJ may not

- 24 -

discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'"  **Id.** (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)).  After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints.  **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past."  20 C.F.R. §§ 404.1520(e), 416.920(e).  The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work.  **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.  **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001).  See also 20 C.F.R. §§ 404.1520(f), 416.920(f).  The Commissioner may meet his burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and

capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion.'" **Wiese**, 552 F.3d at 730 (quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Id.**; **Finch**, 547 F.3d at 935; **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999). The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." **Wheeler v. Apfel**, 224 F.3d 891, 894-95 (8th Cir. 2000). See also **Owen v. Astrue**, 551 F.3d 792, 798

(8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

### Discussion

Plaintiff argues that the ALJ erred (1) when evaluating her obesity and its affect on her RFC and (2) by failing to order a consultative mental examination.

Obesity.  "The RFC 'is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities,' despite his or her physical or mental limitations."  **Roberson v. Astrue**, 481 F.3d 1020, 1023 (8th Cir. 2007) (quoting SSR 96-8p, 1996 WL 374184, at *3 (July 2, 1996)); accord **Masterson v. Barnhart**, 363 F.3d 731, 737 (8th Cir. 2004); **Depover v. Barnhart**, 349 F.3d 563, 567 (8th Cir. 2003).  "When determining a claimant's RFC, the ALJ must consider all relevant evidence, including the claimant's own description of her or his limitations, as well as medical records, and observations of treating physicians and others."  **Roberson**, 481 F.3d at 1023.  See also SSR 96-8p, 1996 WL 374184 at *5 (listing factors to be considered when assessing a claimant's RFC, including, among other things, medical history, medical signs and laboratory findings, effects of treatment, medical source statements, recorded observations, and "effects of symptoms . . . that are reasonably attributed to a medically determinable impairment").

Plaintiff argues that the ALJ's failure to discuss her obesity when assessing her RFC is a fatal error.  Obesity is to be considered "a 'severe' impairment when, alone or in combination with another medically determinable physical or mental impairment(s), it

significantly limits an individual's physical or mental ability to do basic work activities."

Social Security Ruling 02-01p, 2000 WL 628049, *4 (S.S.A. 2002).  And, as noted by

Plaintiff, the regulations provide that:

> [o]besity is a medically determinable impairment that is often associated with disturbance of the musculoskeletal system, and disturbance of this system can be a major cause of disability in individuals with obesity. The combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately. Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity.

20 C.F.R. Pt. 404, Subpart P, Appx. 1, § 1.00(Q).

In the instant case, Plaintiff did not cite obesity as a disabling condition on her

applications, on forms she completed, including the Disability Report she completed pursuant

to her earlier applications,[18] or in her testimony.[19]  In **McNamara v. Astrue**, 590 F.3d 607,

611 (8th Cir. 2010), the Eighth Circuit rejected an argument that the ALJ had erred by failing

to discuss in her decision the claimant's obesity "as a potential work-related limitation."  The

court noted that no physician had "ever placed physical limitations on [the claimant's] ability

to perform work-related functions because of her obesity."  **Id.**  Nor had she described such

in an application report or in her testimony.  **Id.**  And, contrary to her argument, see

---

[18]See R. at 178.

[19]Indeed, Plaintiff emphasized at the hearing that her primary problem preventing her from working was her staph infection.  She does not challenge the ALJ's finding that the infection was not a severe impairment.

Plaintiff's Brief at [8], however, the ALJ did consider her obesity to be "a medically determinable impairment"; indeed, the ALJ found it to be a severe impairment.

As noted in Social Security Ruling 02-1p, obesity can complicate chronic diseases of the musculoskeletal body systems, increase the risk of developing hypertension, and cause or contribute to depression.  Social Security Ruling 02-01p, 2000 WL 628049 at *3.  The ALJ evaluated Plaintiff's complaints of body and knee problems and of depression and found all but the knee problems to be severe.[20]  Plaintiff does not challenge these findings.  The ALJ further found that Plaintiff's severe impairments, including obesity, did not singly or in combination, meet or medically equal an impairment of listing-level severity.  The Eighth Circuit Court of Appeals has "held that when an ALJ references the claimant's obesity during the claim evaluation process, such review may be sufficient to avoid reversal."  **Heino v. Astrue**, 578 F.3d 873, 881 (8th Cir. 2009) (citing Brown ex rel. Williams v. Barnhart, 388 F.3d 1150, 1153 (8th Cir. 2004)).  See also **Green v. Astrue**, 2011 WL 749743, *20-21 (E.D. Mo. 2011) (finding that ALJ properly considered claimant's obesity by considering all her medical records and symptoms in light of obesity and concluding that impairments did not meet requirements of listing).

The Court also notes that the ALJ cited Social Security Ruling 02-1p.[21]  See **Yarbrough v. Astrue**, 2012 WL 3235747, *3-4 (E.D. Ark. 2012) (finding that ALJ's citation to Social Security Ruling 02-01p, his statement that he had to consider at step three whether

---

[20]With the exception of a concern expressed in 2010 about high blood pressure reading and never pursued, there is nothing in the record to suggest that Plaintiff had hypertension.

[21]See R. at 16.

- 29 -

the combination of claimant's impairments satisfied a listing, and summary of alleged impairments, including obesity, satisfied requirement that ALJ consider combined effect of impairments, including obesity).

For the foregoing reasons, the ALJ properly considered the effect of Plaintiff's severe impairment of obesity on her RFC.

Consultative Examination.  Plaintiff next argues that the ALJ erred by not sending her for a consultative mental examination based on her testimony about her depression and about a lack of finances preventing her from seeing a psychologist or psychiatrist.

As noted by Plaintiff, "[a] social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record." **Ellis v. Barnhart**, 392 F.3d 988, 994 (8th Cir. 2005).  "[I]t is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision." **Freeman v. Apfel**, 208 F.3d 687, 692 (8th Cir. 2000) (alteration in original).

In **Halverson v. Astrue**, 600 F.3d 922, 933 (8th Cir. 2010), the Eighth Circuit rejected a claimant's argument that the ALJ had erred by not ordering a consultative mental examination, finding that the ALJ had properly based his adverse decision on the medical records, the claimant's statements, and "other evidence."  See also **Johnson v. Astrue**, 627 F.3d 316, 320 (8th Cir. 2010) ("[T]he ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled.") (internal quotations omitted).

In the instant case, as noted by Plaintiff, the ALJ indicated at the end of the May 2010 hearing that he would consider her counsel's request that she be sent for a consultative mental examination.  This does not translate, however, into a promise to do so.  Nor does the ALJ's cited reference in May 2010 to not knowing then to what extent her "depression issues" are severe and are supported by the evidence, see Record at 54-55, translate into the ALJ "not[ing] that from the medical evidence it was impossible to adequately evaluate the severity of Plaintiff's mental condition."  (Pl.'s Br. at [13].)  The medical evidence before the ALJ as to Plaintiff's mental condition included references to her being diagnosed with depression eight years before her alleged disability onset date, see **Byes v. Astrue**, 687 F.3d 913, 916 (8th Cir. 2012) (finding that substantial evidence supported ALJ's decision not to order consultative mental examination when claimant had worked for years "even with cognitive disabilities"), references to her being prescribed anti-depressants by her primary care physician two months after her alleged disability onset date,[22] records of the psychologist she saw twice before canceling subsequent appointments, records of her primary care physician referencing her consulting him about depression a year after she stopped seeing the psychologist, and, forty months later, records of Plaintiff undergoing a mental health assessment after her mother was diagnosed with cancer and several family members had died.  Where there is substantial evidence in the record to support the ALJ's decision, the ALJ does not err in failing to order a consultative examination.  **Haley v. Massanari**, 258 F.3d 742, 749 (8th Cir. 2001).  The paucity of evidence of treatment for Plaintiff's depression does

---

[22]This reference is to Plaintiff getting a refill of her medications; however, there were no earlier records from Dr. Hutchinson before the ALJ.

not detract from this substantiality.[23]  See e.g. **Steed v. Astrue**, 524 F.3d 872, 876 (8th Cir. 2008) (finding that claimant's failure to provide medical evidence supporting her allegations of work limitations "should not be held against the ALJ when there *is* medical evidence that supports the ALJ's decision").

"Where 'the ALJ's determination is based on all the evidence in the record, including the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations,' the claimant has received a 'full and fair hearing.'" **Jones**, 619 F.3d at 969 (quoting Halverson, 600 F.3d at 933).  The ALJ's determination that Plaintiff does not suffer from a disabling mental condition was based on all the evidence.  There is no error in the ALJ failing to send Plaintiff to a consultative mental examination.

### Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision.  "If substantial evidence supports the ALJ's decision, [the Court] [should] not reverse the decision merely because substantial evidence would have also supported a contrary outcome,

---

[23]The Court notes that Plaintiff testified that she had not sought mental health treatment more frequently for financial reasons.  The ALJ found Plaintiff not to be entirely credible, however, and she does not challenge that finding.  Moreover, as noted by the Commissioner, there is "no [other] evidence [Plaintiff] was ever denied medical treatment due to financial reasons," **Goff v. Barnhart**, 421 F.3d 785, 793 (8th Cir. 2005), or sought treatment available to indigents, **Harris v. Barnhart**, 356 F.3d 926, 930 (8th Cir. 2004).  When applying for DIB and SSI in 2004, see R. at 177, Plaintiff stated that she had a medical assistance card, yet the record does not reflect any but occasional attempts to seek mental health treatment.  Indeed, the record reflects that after seeing Dr. Cunningham twice in August 2005, Plaintiff cancelled the next three sessions and never returned; there is no reference to her being denied treatment due to financial considerations.  The record further reflects that she sought treatment at the Family Medical Center when not having a medical assistance card, yet was never turned away.

or because [the Court] would have decided differently." **Wildman v. Astrue**, 596 F.3d 959, 964 (8th Cir. 2010).  Accordingly,

  **IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and that this case is DISMISSED.

  An appropriate Judgment shall accompany this Memorandum and Order.


        /s/ Thomas C. Mummert, III
        THOMAS C. MUMMERT, III
        UNITED STATES MAGISTRATE JUDGE

Dated this  25th  day of September, 2012.